GENERAL TRADING CORPORATION, Appellant in No. 74-2245

v.

BURNUP & SIMS, INC., SEABOARD SURETY COMPANY
and JOHN RANDAL McDONALD, JOHN RANDAL Mc-
DONALD, Appellant in No. 74-1924

# United States Court of Appeals

## Third Circuit

# Argued April 21, 1975

# Filed August 29, 1975

■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■■■■■

ALEXANDER A. FARRELLY, ESQ. (BIRCH, DEJONGH & FARRELLY), St. Thomas, V.I., *for appellant in No. 74-2245 and cross-appellee in No. 74-1924*

ALEX GONZALEZ, ESQ. (GONZALEZ & RODRIGUEZ), Puerto Nuevo, Puerto Rico, *for appellee in No. 74-2245 and cross-appellant in No. 74-1924.*

FREDERICK G. WATTS, ESQ. (LOUD & CAMPBELL), St. Thomas, V.I., *for appellees Burnup & Sims*

Before HASTIE, GIBBONS and HUNTER, *Circuit Judges*

## OPINION OF THE COURT

HASTIE, *Circuit Judge*

This appeal presents a controversy among General Trading Corporation, a landowner which undertook to have a burned-out building restored and remodeled; Burnup & Sims, Inc., a builder which did the work of reconstruction under contract with the landower, and John Randal McDonald, an architect who rendered professional service during the course of the project. The landowner sued the builder and its surety, together with the architect, for damages alleged to have been caused by delay in the completion of the construction work. The builder denied responsibility for the delay and counterclaimed for a balance allegedly due on the construction contract. The builder also crossclaimed against the architect, asserting that he was personally liable for the value of

205

extra work necessitated by his negligence, if the landowner should not be required to pay for it. Finally, the architect counterclaimed for a balance allegedly due from the landowner for his services in connection with the project.

The district court, sitting without a jury, denied the landowner's claim against the builder, found for the builder on its claim against the landowner and imposed upon the architect liability over to the landowner for most of the amount awarded to the builder. The landowner and the architect have appealed.

The burned out building to be reconstructed and remodeled is located in the old historic section of the town of Christiansted on the island of St. Croix. No building can lawfully be constructed or reconstructed in that historic area without the approval of the esthetics of the structure, particularly its compatibility with the old Danish architecture of the neighborhood, by the Virgin Islands Planning Board.

Late in 1968, General Trading decided to have its building reconstructed to accommodate a fashion boutique, featuring a display of merchandise attractive to the tourist trade, on the first floor and rental space on the second and third floors. The parties all knew that General Trading deemed it urgent that the boutique be ready for occupancy at the beginning of the winter 1969–1970 tourist season, and a provision of the contract required completion late in 1969.

Because of the exigencies of time, even before a construction contract was executed, Burnup & Sims, the prospective contractor, and architect McDonald undertook preliminary work, including initial presentations of the proposed reconstruction to the Planning Board. Then, in March, 1969 the landowner and the builder executed a standard American Institute of Architects construction contract. Although McDonald was named in that contract

206

as the architect for the project, he was not a signatory to the document and his testimony is that he was unaware that he had been so designated until the present controversy arose. However, it is not disputed that from March, 1969 until the completion of construction McDonald, both personally and through his professional staff, performed a variety of architectural services in furtherance of the project. These services were rendered at the request of General Trading which received and periodically paid McDonald's billings for his work.

The record is clear that one of McDonald's undertakings for the landowner was the preparation of plans, their presentation to the Planning Board and the Public Works Department, the conduct of negotiations with these agencies and the modification of plans as necessary to obtain governmental approval. Indeed, in his crossclaim for professional services, McDonald alleged that he "rendered architectural services only to General Trading Corporation culminating on Planning Board approval of the plans on 17 April 1969". Very early in 1969, the Public Works Department permitted work on the project to begin but directed that certain changes in design and detail be made and submitted to the Planning Board for approval. Particularly, the Board had advised McDonald that a "hip" roof should be designed and substituted for the combined "gable" and "shed" type of roof contemplated by the original proposal. McDonald correctly understood that to satisfy this requirement the pitch of the planes of the roof had to be "3 or 4 to 12", a rise of 3 or 4 feet for every 12 feet that it extended horizontally.

The building in question is roughly "L" shaped, the bottom of the "L" being a rectangular section fronting on Church Street, while the upper part of the "L" is a smaller rectangle extending to the rear toward Government House. As the reconstruction was conceived in the original

thinking of the parties, a gabled roof would cover the front section of the building, while the rear section would be covered by a flat, or almost flat, shed roof. In contrast, a hip roof characteristically inclines upward from the eaves on every side of the building toward a ridge.

McDonald, acting for General Trading, undertook to modify the original concept of the roof to eliminate gables and substitute hips that would provide the "Danish type" of roof that is characteristic of the historic area and required by the Planning Board. In this connection, the in-house architect of the Board had prepared a sketch, an elevation apparently not drawn to precise scale, indicating the change from gable to hip and reciting the height "6 feet" as the estimated rise of the roof from eaves to ridge. McDonald then made a tracing of this sketch, eliminating the "6 feet" recital and substituting the phrase "as required" with reference to vertical rise of the hips. Detailed drawings of the original concept that combined gable and shed roof design, together with this new McDonald sketch of required modification, were placed in the hands of the contractor who, in turn, passed this data on to a manufacturer to prepare shop drawings and to fabricate the essential metal framework for the building.

McDonald has conceded that he understood that the Planning Board wanted the entire roof structure to be hipped so that it would show a pitch of 3 or 4 to 12 along each face. But the sketch he had prepared, copying the illustrative elevation drawn by the Board's in-house architect, showed a roof change from gable to hip, but without treating with particularity the roofing of the wing to the rear of the building. At best McDonald's sketch was ambiguous as to what was to be done about the roof of the rear wing. Cf. Covil v. Robert & Company Associates, 1965, 112 Ga. App. 163, 144 S.E.2d 450. Utilizing this sketch and the original plans for a gable and shed roof, the fabricator

of the metal work prepared working drawings and designed a skeleton appropriate for carrying a roof over the rear wing pitched at not more than 1 to 12, though it could accommodate 3 or 4 to 12 hips over the front section.

McDonald testified that technically a roof area with a 1 to 12 pitch was hipped, since it was not quite flat, although he knew that was not what the Planning Board required. However, he also testified that the contractor never showed him the fabricator's working drawings. This testimony was explicitly contradicted by the contractor's construction manager and principal witness, Joseph Caudill, who testified that he had discussed with McDonald the modification of the roof to provide hips with moderate pitch over the front section while retaining a very low pitch for the rear wing, had later showed him the fabricator's detailed shop drawings that incorporated these features and had proceeded on the basis of the modified design only after McDonald had approved it, first in general concept and then as shown in the fabricator's shop drawings.

The district court, which sat without a jury, did not make a specific finding on this disputed question of fact, but we read the court's opinion as implicitly finding that McDonald was aware of and sanctioned the design of the roof for the rear wing as it was in fact constructed.

Beyond this, it is agreed that McDonald had undertaken the responsibility of certifying to the owner whether the contractor's monthly billings for progress payments represented material and work duly supplied or performed. This necessarily required periodic site observations by McDonald or some professional member of his staff.

 The construction work relevant to the present controversy was undertaken and nearly completed during the spring and summer of 1969, and McDonald periodically certified this work to the owner for payment. Indeed,

it was not until October 30, 1969, after the public authorities, spurred by citizen complaints, had questioned the design of the roof in place, that McDonald qualified his earlier certification of this work with a notice to the contractor that the roof was improperly designed and pitched. By so doing he recognized that his professional responsibility extended to the monitoring of this aspect of the work. Whether he did not observe sooner the very low pitch of a substantial section of the framework for the roof or, having observed it, chose not to inform the owner or the contractor that Planning Board requirements were not being satisfied, the district court reasonably concluded that McDonald's conduct did not exhibit the care and professional judgment required of an architect to whom an owner has entrusted certification of work for progress payments. "[T]he standards of reasonable care, which apply to the conduct of architects, are the same as those applying to . . . like professional men engaged in furnishing skilled services for compensation . . . ." See Peerless Ins. Co. v. Cerny & Associates, Inc., D. Minn. 1961, 199 F.Supp. 951, 953. Cf. Aetna Ins. Co. v. Hellmuth Obata & Kassabaum, Inc., 8th Cir. 1968, 392 F.2d 472; Nieman-Irving & Co. v. Lazenby, 1933, 263 N.Y. 91, 188 N.E. 265; Restatement of Torts, § 552. Here the finding of negligence is buttressed by the fact that McDonald, acting for the landowner, was the professional who had conducted the negotiations with the Planning Board that had culminated in the hip roof requirement and the additional fact that his sketch of the required modification was ambiguous.

McDonald's conduct has legal significance in connection with several of the claims presented in this suit. In the original complaint the landowner seeks to recover from the builder for economic loss allegedly sustained because of delay beyond the agreed completion time in finishing the building. As a result of the Planning Board's stop order, it

was necessary to remove part of the roof and to design and superimpose on the existing structure a wooden truss to support a properly hipped roof over the rear section of the building. The additional time required for this work caused the delay in suit. But on the present record it was a permissible conclusion that this delay resulted from the architect's sanction of the unacceptable roof design and his periodic approvals of work in progress that disclosed the low pitch of the roof.

We have not overlooked the fact that the construction contract incorporated a letter that stipulated generally that the reconstruction must satisfy Planning Board requirements. But, as between the principal parties, the builder was entitled to treat sanction of the low pitch of the rear roof by the owner's architect as the owner's own approval. Cf. Beattie Mfg. Co. v. Heinz, 1906, 120 Mo. App. 465, 97 S.W. 188. Of course, the architect's tardy disapproval, after the Planning Board had indicated dissatisfaction with the substantially completed roof, came too late to affect the issue of responsibility for delay. The landowner was properly denied recovery from the contractor for delay in completion of the building.[1]

The district court allowed the builder to recover from the landowner on "Change Order No. 6", which both parties executed after the stop order to cover the work and materials required to modify the then practically completed roof to conform with Planning Board requirements. We agree with the district court that as "between the contractor and the owner, General Trading must bear the . . . [added expense] resulting from the negligence of its architect". Moreover, as the court properly added, "General Trading nonetheless does have the right to

---

[1] The district court also found on this issue that proof of damage was inadequate.

recover damages from McDonald to the extent of its losses that were directly caused by McDonald's negligence".

The district court accorded separate consideration to several small items that were included in the claims of the parties. We have examined each of these items and find no reversible error in their disposition.

Finally, McDonald claims that General Trading owes him $7,000 pursuant to his unpaid billing for certain architectural work. Apparently this work consisted of the design of interiors, particularly for the first floor boutique. We find no disposition of this claim in the opinion or in the judgment of the court. It should be adjudicated, either on the present record alone or with a supplementary evidentiary hearing as the district court shall deem just and proper.

Accordingly, the judgment as entered will be affirmed and the cause remanded for further proceedings and whatever supplementary judgment may be appropriate on McDonald's claim against General Trading for services rendered.

The costs of Burnup and Sims in this court shall be awarded against General Trading and McDonald. However, as concerns the controversy between General Trading and McDonald, neither shall be awarded costs as against the other.